# In the United States Court of Federal Claims

No. 23-6 L

Filed: March 21, 2024

|  |  |
|---|---|
| CLOGIC LLC, | ) ) ) |
| *Plaintiff*, | ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*. | ) ) ) |

*Daniel Patrick Graham*, McDermott Will & Emery, Washington, D.C., for Plaintiff.

*Eric Evan Laufgraben*, Civil Division, U.S. Department of Justice, for the United States.

## OPINION AND ORDER

When the Air Force needed to upgrade a group of mine-resistant vehicles, it turned to CLogic LLC to provide the upgrade equipment and manage the installation of this equipment on the vehicles by a subcontractor, Navistar. Although the project would eventually upgrade 142 vehicles, it was to proceed in phases. Each phase would cover the upgrade of a subset of the 142 vehicles as funding came available. Despite only having a contract for the first phase vehicles, CLogic procured the upgrade equipment for all 142 vehicles at once and planned to provide (and be paid for) the upgrades as the Air Force approved additional vehicle upgrades.

At first, all went well. The Air Force accepted upgraded vehicles and paid for most of them. Then the Air Force took a new course. It cancelled the program and eventually hired Navistar directly to perform the upgrade work. The dispute here involves the upgrade equipment that CLogic purchased for the vehicles, which it had transferred to Navistar to install on the Air Force vehicles. When the Air Force ended CLogic's involvement in the program, CLogic demanded Navistar return the upgrade equipment that had not been installed. Navistar refused to do so, informing CLogic that the Air Force directed Navistar to retain the property because all of it belonged to the Air Force.

CLogic alleges that the Air Force took its property, the upgrade equipment, for public use without paying just compensation. The Air Force moves to dismiss, claiming that any wrongdoing was by Navistar and CLogic thus fails to state a claim. Because the complaint plausibly alleges that the Air Force, acting through its contractor, took CLogic's property for public use without paying just (or any) compensation, the Court denies the Government's motion to dismiss.

I. **Background**[1]

In 2018, the United States Air Force determined that it needed to "reset and standardize" a fleet of mine-resistant ambush protected vehicles, or "MRAPs." ECF No. 1 at ¶ 2. This standardization included the installation of new hardware and upgrading some existing components. To complete this work, the Air Force worked with the DoD Ordnance Technology Consortium ("DOTC") to develop the MRAP reset. *Id.* at ¶ 28. DOTC serves as the DoD's "focal point for ordnance technology research and development." *Id.* at ¶ 17. Its primary mission is to increase the combat effectiveness and survivability of the armed forces. *Id.* at ¶ 18. DOTC is made up of two components: the military branches on one side and the National Armaments Consortium ("NAC") on the other. The NAC consists of more than 850 academic institutions and companies, including CLogic. *Id.* at ¶¶ 20-21.

There is an Other Transaction Agreement (the "OTA") between DOTC and the NAC under which DOTC awards NAC members prototyping projects. *Id.* at ¶ 22. When DOTC awards a NAC member a project, it awards an Ordnance Technology Initiative Agreement ("OTIA"), which contains all the requirements and obligations of the project. *Id.* at ¶ 24. This includes the scope of the work, the terms of the project, and payment information.[2] This case involves an OTIA between DOTC and CLogic for the upgrades to the Air Force MRAPs.

CLogic worked with the Air Force and the Army Contracting Command – New Jersey ("ACC-NJ"),[3] to craft a project for the MRAP reset and standardization. In 2018, they agreed to a statement of work to upgrade 142 MRAPs that was to proceed in two phases. In Phase 1, CLogic would upgrade 48 MRAPs and in Phase 2 it would upgrade the remaining 114 MRAPs. *Id.* at ¶ 29. The original cost estimate for this work was $62 million, which DOTC would fund through a series of OTIAs. *Id.* at ¶ 29. Under the original agreement, the Government was to provide much of the materials to be installed on the MRAPs. *Id*.

Work under Phase 1 began in late 2018. CLogic executed a purchase order with a subcontractor—Navistar—to perform the actual installations of the equipment on the 48 MRAPs under Phase 1 in October 2015. *Id.* at ¶ 32. While Navistar would perform the installations, CLogic was responsible for the management of the project, transportation of the MRAPs, supplying certain equipment, and related tasks. *Id.* at ¶ 33. For reasons that are not yet clear, the Air Force could not supply much of the materials that it was supposed to under the OTIA. Therefore, it directed CLogic to provide much of the hardware for the reset and standardization project. *Id.* at ¶ 35. Acting on this direction, CLogic procured a significant amount of materials for the upgrades of all 162 MRAPs, even though Phase 1 only covered 48 MRAPs. *Id.* In addition to purchasing materials itself, there were some long lead time items that Navistar

---

[1] Because this is a motion to dismiss, the Court does not make factual findings; rather, the Court assumes the well-pleaded facts in the complaint are true when resolving this motion.

[2] While this sounds much like a contract, an OTIA is not a procurement contract. ECF No. 1 at ¶ 22. To avoid confusion, the Court does not refer to the OTIA as a "contract."

[3] Each member of the NAC had a "base agreement" with the DOTC, which served as the baseline for all OTIAs. *Id.* at ¶¶ 25-26. For CLogic's base agreement, ACC-NJ was the entity charged with executing the OTIAs. *Id*. at ¶ 27.

purchased directly for all 162 MRAPs but CLogic paid for. *Id.* at ¶ 50. CLogic procured the materials for all 162 MRAPs without a contract for 114 of them because it expected the Government to complete the upgrades on all 162 MRAPs and pay for the materials as they were installed. *Id.* at ¶ 35.

In January 2019, while CLogic was proceeding under Phase 1, the Air Force and Army signed an agreement for the Air Force to fund the entire project—*i.e.*, the upgrades for all 162 MRAPs.[4] *Id.* at ¶ 36. They made the effective date of the funding agreement October 1, 2018, which was the beginning of the project. *Id.*

In July 2019, the Air Force accepted all 48 of the Phase 1 MRAPs. *Id.* at ¶ 37. CLogic was paid for its work on Phase 1, but the Air Force deferred payment for the upgrade equipment for the remaining 114 MRAPs until later in the project. *Id.*

For budgetary reasons, the Air Force split the remaining 114 vehicles into two separate phases. Phase 2 would now cover the upgrades of 50 MRAPs and a new Phase 3 would cover the remaining 64 MRAPs. *Id.* at ¶ 38. Phase 2 proceeded much as Phase 1 had. CLogic executed another purchase order with Navistar for the upgrade work on 50 MRAPs, while CLogic performed the same managerial and oversight functions as before. *Id.* at ¶ 40.

As they neared the end of FY2018, however, ACC-NJ cancelled Phase 2, de-obligated the funding for the Phase 2 work, and returned more than $22 million to the Air Force. *Id.* at ¶ 41. This left CLogic without any funding to pay for either its Phase 2 work or the materials that it purchased for the project (*i.e.*, the materials to upgrade all 162 MRAPs). The project apparently hung in limbo for about a year until September and October 2020, when the Defense Logistics Agency ("DLA") issued two purchase orders to cover the cost of upgrading 39 MRAPs upgraded under Phase 2. *Id.* at ¶ 43. This allowed CLogic to pay Navistar and provided a mechanism for the Air Force to inspect the 39 MRAPs. *Id.* at ¶ 44. The Air Force accepted all 39 MRAPs in November 2020. *Id.* at ¶ 44.

Despite the acceptance of these 39 MRAPs, the Air Force did not pay for the materials or work associated with the 11 remaining Phase 2 MRAPs nor the 64 Phase 3 MRAPs. *Id.* at ¶ 47. CLogic engaged with the Air Force about payment for the materials it purchased for the 75 MRAPs that had not yet been upgraded, but it soon became clear that funding would not be forthcoming. *Id.* at ¶ 48. Seeing the writing on the wall, CLogic turned to Navistar and demanded the return of the materials that it provided for the upgrades as well as the items that Navistar purchased but CLogic paid for. *Id.* at ¶ 51. After months of communications between CLogic and Navistar, Navistar finally responded: "We have been informed that the material you've described . . . belongs to the US [sic] Air Force." *Id*. at ¶ 51.

The Air Force did eventually complete the upgrades on all the MRAPs without CLogic. Instead, the Air Force hired Navistar directly to perform the upgrades on the remaining 75

---

[4] For reasons that are beyond the scope of this opinion, the Air Force transferred funds to the Army that the Army then used to pay CLogic under the OTIA. Because it was ultimately Air Force funds paying CLogic, the Court refers to the Air Force funding the project rather than the Army doing so, even though the funds passed through the Army on their way to CLogic.

MRAPs. *Id.* at ¶ 54.[5] Of course, Navistar could offer the upgrades at a lower price because it did not need to include the cost of any of the materials that CLogic procured or paid for (at the Air Force's direction). *Id*. at ¶ 62. Nor did the Air Force pay CLogic for any of these materials despite claiming ownership and instructing its contractor, Navistar, not to return them to CLogic.

CLogic sues for the value of the materials it provided to Navistar for installation on the MRAPs but has yet to be paid for, claiming the Air Force has taken this property for public use without just compensation.

## II.     Legal Standard

"A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the plaintiff do not entitle him to a legal remedy." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006) (quoting *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000)). As the Supreme Court has explained, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And to be "plausible on its face," it "does not need detailed factual allegations." *Twombly*, 550 U.S. at 555; *see also Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (Rule 8 "does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face."). In other words, the complaint must contain enough detail "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) (citations omitted). Nevertheless, the Court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *United Pac. Ins. Co.*, 464 F.3d at 1327-28 (quoting *Anaheim Gardens v. United States*, 444 F.3d 1309, 1314-15 (Fed. Cir. 2006)).

## III.    Discussion

The Fifth Amendment's Takings Clause provides that "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The government may take private property "either by physical invasion or by regulation." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) (citation omitted). The Government argues at some length that Plaintiff has failed to allege a regulatory, or *Penn Central*, taking. On this narrow issue the parties agree: "CLogic only alleges a physical taking of its property." ECF No. 10 at 15 n.3. Therefore, the Court only considers whether there was a physical taking of CLogic's property.

To analyze a takings claim, the Court applies a two-part test. "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is

---

[5] The Government contends that it only purchased 11 MRAP upgrades from Navistar, not 75. ECF No. 7 at 2 n.3. While that may or may not be factually true, it is irrelevant to the Court's analysis under RCFC 12(b)(6), which requires the Court to assume the well-pleaded facts to be true. The proper time for such an argument is summary judgment or trial.

asserted to be the subject of the taking.  Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'"  *Acceptance Ins. Cos., Inc.*, 583 F.3d at 854 (citations omitted).  The Government argues that CLogic fails both prongs of the test.

The Government moves to dismiss CLogic's complaint because the claims "represent[] CLogic's attempt to secure payment allegedly owed by a business partner under the guise of a takings claim against the Government."  ECF No. 7 at 5.  The Government's primary argument is that CLogic's complaint does not "identify [an] action by which the Government itself actually took property . . . from CLogic."  ECF No. 13 at 1.  Although the Government acknowledges that CLogic's complaint alleges that an unnamed government employee "directed" Navistar to retain CLogic's equipment, ECF No. 7 at 6, the Government asserts that direction is not enough because Navistar had previously ignored CLogic's demands to Navistar in the preceding six months.  ECF No. 13 at 1.  Framed differently, the Government argues that it cannot be responsible, as a matter of law, for Navistar's refusals to return CLogic's equipment.  *Id.* at 2.

### A.     CLogic plausibly alleges that it had cognizable property interests in the upgrade equipment.

CLogic asserts a simple property interest—it bought and paid for the materials to be installed on the MRAPs, thereby owning the materials.  CLogic's complaint alleges a "classic taking—one in which the government directly appropriates private property for its own use."  ECF No. 10 at 5 (citing *Horne v. Dep't of Agric.*, 576 U.S. 350, 357-58 (2015)).  It is beyond rational dispute that when a party buys materials and equipment with its own funds, it owns those materials.  This proposition is so sound that it requires no further exposition.  And when the government physically takes personal property, it is a *per se* taking that requires compensation just as when the government takes real property.  *E.g.*, *Horne*, 576 U.S. at 358 ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home.").

The Government, however, insists that that CLogic lost its property interests in the disputed materials once it delivered them to Navistar.  ECF No. 7 at 11.  But this argument finds no support in the complaint whatsoever, which is, of course, a problem for a Rule 12(b)(6) motion.  According to the Government, when CLogic transferred the upgrade equipment to Navistar, title transferred to Navistar and CLogic no longer had any cognizable property interest in them.  This argument, however, is not based on the complaint; rather, it is based on the Ninth Circuit's holding in *Helash v. Ballard*, 638 F.2d 74 (9th Cir. 1980).  But *Helash* is readily distinguishable from this case.

Mr. Helash[6] was a subcontractor that supplied steel to a prime contractor to be used in the construction of a power plant by the Air Force.  *Id.* at 75.  When the prime contractor failed to pay him for the steel he delivered, Helash sued the Air Force for payment.  *Id.*  In *Helash*, the Ninth Circuit held that once the subcontractor handed over the steel to the prime contractor, the

---

[6] Mr. Helash was a sole proprietor doing business as John Helash Steel Construction.

title to the steel passed from Helash to the prime contractor, foreclosing the subcontractor's claims. *Id.*

*Helash* is not dispositive of this case. First, of course, *Helash* is a Ninth Circuit opinion that is not binding on this Court. *Bankers Tr. N.Y. Corp. v. United States*, 225 F.3d 1368, 1371 (Fed. Cir. 2000). Second, accepting the Government's *Helash* argument here would require the Court to divine the terms of an agreement not before it—*i.e.*, the agreement between CLogic and Navistar—and conclude that California's Uniform Commercial Code governs that contract as it did the contract in *Helash* without any basis in the complaint for concluding that California law applies. *See Helash*, 638 F.2d at 76 (applying California law to the contract because it arose in California). Because this is a Rule 12(b)(6) motion, the Court may do neither. Finally, as CLogic correctly points out, the parties in *Helash* were aligned in opposite roles compared to the instant case. Perhaps if CLogic were the subcontractor who provided the equipment to Navistar under a sales agreement, then *Helash* might prove more instructive. In that case, perhaps a supplier would transfer title to property when it delivered property to the prime contractor (unless the contract provided otherwise). But the opposite is true here—Navistar was CLogic's subcontractor and there is nothing in the complaint indicating that Navistar was purchasing the upgrade equipment from CLogic.

Although not directly on point, *Norcoast Constructors, Inc. v. United States*, 448 F.2d 1400 (Ct. Cl. 1971), provides some insight. In *Norcoast*, the contract provided that the plaintiff would "furnish and install" tanks for the Government. The Government, in return, argued that those words meant the plaintiff had passed title in the tanks to the Government. The court disagreed, holding that "the words do not operate of themselves to pass title." *Id.* at 1404. Similarly, here, the words used in CLogic's complaint do not clearly show, or even remotely imply, that CLogic intended to or did pass title to Navistar. The complaint alleges that CLogic maintained "overall management, oversight, and control of the efforts," which included providing its own equipment for Navistar to use. Perhaps discovery will show that title passed, maybe it will not. But resolution of that question requires a record that is not before the Court at this stage.

The Court, therefore, agrees with CLogic's argument that its transfer of the upgrade equipment to Navistar created a bailment. A bailment is "the delivery of [property] by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose." *Carpenter v. United States*, 138 S. Ct. 2206, 2268 (2018) (Gorsuch, J., dissenting) (citing Black's Law Dictionary 169 (10th ed. 2014)). Put another way, "[a] bailment relationship is said to arise where an owner, *while retaining title*, delivers personalty to another for some particular purpose upon an express or implied contract." *Lionberger v. United States*, 371 F.2d 831, 840 (Ct. Cl. 1967) (emphasis added). Importantly, a bailment does not divest the bailor of its title or property interest. *See, e.g.*, *id.*; *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012); *Ekco Prod. Co. v. United States*, 312 F.2d 768, 771 (Ct. Cl. 1963); *see also S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 90 (2d Cir. 2002) ("[U]nder the law of bailment, as the District Court recognized, a bailee acquires only a possessory interests in the property pledged, while the bailor retains legal and equitable title.") (citation omitted); *Maulding v. United States*, 257 F.2d 56, 61 (9th Cir. 1958) ("A bailor has a general property interest in the property . . . [a] bailee has no property interest in the bailment.").

The Government, however, contends that "CLogic already relinquished the rights to possess and use the hardware, and to exclude Navistar in that a 'bailment gives the bailee [Navistar] the sole custody and control of the article bailed, or the right to exclusive possession of the property, even against the bailor [CLogic].'"  ECF No. 13 at 7-8 (citing 8 C.J.S. Bailments § 34 (Title and right of bailee)).  That argument misses the mark.  The question before the Court is whether CLogic held title to the property, not whether Navistar, as bailee, had the right to possess the property.

Further, the Government ignores an important part of the bailment relationship explained in the same treatise the Government itself relies upon.  That is, "if the bailment is for a specified period, the bailee has the right to the possession of the property during that period; until the right has expired, it is paramount to any right of the bailor, her assignee, or her creditors, *unless the bailee violates the conditions of the contract*."  8 C.J.S. Bailments § 34 (emphasis added).  Putting aside the fact that there is no contract between Navistar and CLogic before the Court, there is a bigger problem.  There is nothing in a bailment relationship that would allow Navistar, the bailee, to keep the property after the end of the relationship with CLogic because a bailment is "a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it *shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it*, as the case may be."  *Kam-Almaz*, 682 F.3d at 1368 (quoting 19 Williston on Contracts § 53:1 (4th ed. 2012)) (cleaned up) (emphasis added).  And there is certainly nothing currently before the Court that would indicate that Navistar was empowered to transfer title to the property to the Government at the *Government's* direction.  Indeed, the Government was not (so far as the Court can tell) a party to the bailment relationship.  What is before the Court is the allegation that the relationship between CLogic and Navistar ended, *see* ECF No. 1 at ¶¶ 47-54, which would have triggered Navistar's obligation to return the property to CLogic.  The complaint also clearly alleges that Navistar refused to return the property because the Air Force directed Navistar (then its contractor) not to return the property because the Air Force owned it.  *Id*. at ¶ 52.

Because the complaint plainly alleges that CLogic purchased the upgrade equipment, CLogic held all the bundle of property rights.  When viewing the complaint in the light most favorable to CLogic, the fact that it bailed the equipment with Navistar does not change the fact that CLogic held title to the property when the Government allegedly took title to it.  This is because CLogic, as the bailor, did not relinquish its ownership of the property it bailed with Navistar, the bailee.  CLogic, therefore, plausibly alleged a cognizable property interest.  Finally, because it is this cognizable property interest that CLogic alleges the Air Force took, CLogic satisfies the first prong of the takings analysis.

> **B.     CLogic plausibly alleges that the Air Force took its property interests in the upgrade equipment.**

The Government also contends that even if CLogic retained a legally cognizable property interest, it cannot plausibly allege that the Air Force took its property because it was Navistar, not the Air Force, that refused to return the property.  But the Court is not so quick to throw Navistar under the bus (or MRAP as the case may be).  Just because a third-party refused to return the property to CLogic, however, does not mean the Government is off the hook.  There

are circumstances in which a third party acting at the direction of the Government can be considered governmental action for claims under the Takings Clause.

As the Federal Circuit explained, "a Fifth Amendment taking may occur when the government commands actions by a third party that would constitute a taking if undertaken directly by the government." *Tex. State Bank v. United States*, 423 F.3d at 1377. Thus, when a "government command to a third party results in the transfer of alleged private property to the United States, we think that the United States must bear responsibility if a direct government appropriation would itself constitute a compensable taking." *Id.* At oral argument, the Government conceded that if the Air Force itself took physical possession of the upgrade equipment, it would have been a compensable taking. ECF No. 16 at 28-29 ("If the government came onto CLogic's property and actually took, you know, hardware kits from them . . . [t]hat's, of course, a physical taking."). But this does not end the inquiry because it was Navistar that refused to return the upgrade equipment to CLogic (allegedly at the Air Force's direction). The Court must, therefore, determine whether Navistar "[was] acting as the government's agent or the government's influence over [Navistar] was coercive rather than merely persuasive." *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014) (citations omitted).

After terminating CLogic, the Air Force hired Navistar directly to perform the upgrade work on remaining MRAP vehicles. ECF No. 1 at ¶ 54. And the Air Force not only claimed ownership of upgrade equipment, it also directed Navistar not to return the equipment to CLogic. *Id.* ¶ 52. These allegations suffice to put this case within the line of cases finding governmental coercion can create takings liability. The Air Force had, according to the complaint, a "direct and substantial" role in the harm to CLogic. Indeed, CLogic alleges that it was the Air Force's explicit direction to Navistar, then its contractor, not to return the upgrade equipment to CLogic because of the Air Force's claim of ownership that resulted in the taking. Government liability may exist because Navistar was "hired . . . to carry out the government's business." *A & D Auto Sales*, 748 F.3d at 1154 (citations omitted); *see also Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20–21 (1940) ("In that view, it is clear that if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."). Assuming the facts of the complaint are accurate, the Court finds it plausible that the Government took CLogic's property interest in the upgrade equipment.

The Government's argument that there was no coercion over Navistar is unavailing. The complaint clearly alleges that the Government hired Navistar to do the upgrade work and issued its direction to Navistar not to return the upgrade equipment to CLogic in the performance of that contract. This is not a case in which the Government was merely aware of its contractor's decision to keep CLogic's property and, therefore, not liable for taking CLogic's property. *E.g., Shewfelt v. United States*, 104 F.3d 1333, 1337 (Fed. Cir. 1997). Quite the contrary, the complaint plainly alleges that the Air Force specifically directed Navistar not to return the property.

Nor was the Air Force's direction not to return property to CLogic merely "friendly persuasion" that would not create liability for the Government. *Tex. State Bank*, 423 F.3d at 1377 (quoting *Langenegger v. United States*, 756 F.2d 1565, 1572 (Fed. Cir. 1985)). Contrary to the Government's argument, the issue is not whether "Navistar lacked discretion to decide for

itself whether" to return CLogic's equipment.  ECF No. 13 at 5.  Again, Navistar was the Government's contractor and could face default for refusing to comply with the Air Force's direction under their contract.  There is no requirement that Navistar "test the government's resolve" by refusing the Air Force's direction before CLogic may argue sufficient coercion. *Katzin v. United States*, 908 F.3d 1350, 1362-63 (Fed. Cir. 2018) (citing *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed. Cir. 1983)).

Similarly unavailing is the Government's attempt to cast its direction as a "mere . . . assertion of ownership [that] does not constitute a taking."  *Katzin*, 908 F.3d at 1360.  *Katzin* is readily distinguishable because there was no relationship between the government and third party there.  In *Katzin*, the claim involved title to a tract of land in Puerto Rico.  Over time, there was confusion as to who owned the property, with Katzin and the government both claiming title.  While Katzin was attempting to sell the property, a prospective purchaser reached out to the government about its ownership claim.  The government replied with information about its claim, which the Federal Circuit concluded was not a taking of Katzin's property.  Critically:

> [T]he government did not: physically occupy some part of Plaintiffs' property, require Plaintiffs to suffer a permanent physical invasion, directly appropriate Plaintiffs' property, effect the functional equivalent of an ouster of Plaintiffs' possession, or deprive Plaintiffs of all economically beneficial use of Plaintiffs' property.  Indeed, the Beasley fax did nothing more than disseminate information about the government's property claims to Mr. Klaber and other potential buyers; it did not actually change any rights in any part of Parcel 4.

*Katzin*, 908 F.3d at 1362.  That is not the case here because the complaint plausibly alleges that the Air Force's direction appropriated CLogic's property.

Finally, the Court cannot credit (at this stage) the Government's argument that because Navistar refused to return CLogic's property for months before stating that the Air Force claimed ownership, there could not have been any coercion.  There is nothing in the complaint that would indicate Navistar was acting on its own for months and then received the Air Force's direction not to return the property.  The complaint does not allege when the Air Force gave its direction, which is understandable given that CLogic was not a party to the communication.  It only alleges when Navistar told CLogic that the Air Force claimed ownership and directed it not to return the property.  It is plausible that Navistar was acting at the Air Force's direction all along.  That is a factual question for another day.

In the end, "[t]he line between coercion (which may create takings liability) and persuasion (which does not create takings liability) is highly fact-specific and hardly simple to determine."  *A & D Auto Sales, Inc.*, 748 F.3d at 1154.  Fact-specific inquiries are rarely resolved at the motion-to-dismiss stage.  *See, e.g.*, *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1364 (Fed. Cir. 2013) ("A court's task in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (citing *Levitt v. Bear Stearns & Co.*, 340 F.3d 94, 101 (2d Cir. 2003)); *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir.

1993) ("Thus, to the extent that factual questions are raised and are material to the result, dismissal is improper unless there is no reasonable view of the facts which could support the claim."). Here, assuming the facts in the complaint to be true as the Court must do under Rule 12(b)(6), CLogic plausibly alleges that the Air Force took its property by directing Navistar not to return the upgrade equipment to CLogic. Today, rather than being in CLogic's possession, that upgrade equipment is installed on military vehicles—a quintessential public use.

### IV.     Conclusion

Maybe CLogic can prove its allegations. Maybe it cannot. That is a question for another day. Because CLogic has stated a claim upon which this Court may grant relief, the Court **DENIES** the Government's motion to dismiss, ECF No. 7.

It is so ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge
